Judge Robertson delivered the following response of the court, to the petition for re-hearing.
The opinion, in this case, was more favorable to Barnet, than it ought to have been, if it be proper to construe it as the counsel have dope in their petition.
As he knew, when he obtained an assignment on the plat and certificate, from Patton, that the land belonged to James Bell, be should be held responsible for rpnts, from the time when he took possession. Ewing’s heirs, et al. vs. Handley’s executors, IV. Littell’s Rep’s. 374; and Thompson vs. Mason, et ux. IV. Bibb, 199.
The circuit court allowed for rents, only from the date of the institution of the suit, by Bell’s heirs; and in this, therefore, there is error, to .the prejudice of Bell’s heirs. This idea, we intended to convey in the opinion, but perhaps, we were not sufficiently explicit.
be^ouncí'for rents, only from institu--he hnotUenti-tied to prime cost of his ini-E3T* their value, from time of rentsTgainst him.
Barnet could not expect a more liberal allowance for improvements, than the opinion has authorized.
If he should not pay rents, before the institution of the suit by he would be entitled, not to the cost of his improvements, but only to-their real value, at (-¡me 0f assessing rents against him. This princi-P^8 >s settled in the case in IV. Littell, and is surely sanctioned by the plainest dictates of equal justice, The case in IV. Littell, on the authority of which, this had been decided, establishes a criterion for as-séssing improvements much more liberal; than that which has been fixed by rhany other courts. The suPreme court of the Union, has decided, that the allowance for improvements should no.t exceed the rents. Green vs. Biddle, VIII. Wheaton, 1.
We cannot concur with the counsel, that any principle of equity, or any authority, when rightly understood and applied, has been disregarded by the court in refusing to allow for improvements, made since 1816, more than the accessary value which they have imparted to the land.
Although, in fad, these improvements may not have been made '■'•mala fide,” yet, in law, they cannot be considered as having been made bona fide.
By the decision of this court, in 1816, he was notified that the land was not his. He ought not, therefore, to be suffered to impose on the rightful owners of it, any burden, for which they could not be indemnified in the enhanced value of their land.
Ought he tobe paid by them, for destroying timber by clearing the land, if the land be less valuable when cleared, than it was when in its foreststate? Ought he to be reimbursed the cost of buildings, which are unnecessary, and do not increase the value of the land? If this would be just, by persisting in efforts (o postpone a final decree, and in the mean time, making a prodigal and improvident expenditure of labor, by which the value of the land might be diminished, instead of being augmented, be might virtually defeat Bell’s heirs, and hold the land, notwithstanding, their admitted right to it- Because, in this way* they might be taxed with a sum for this species *529 óf im'provement, which would exceed the value of ■the land, with all its improvements upon it. This would be unjust, and is forbidden by an unbroken series of approved decisions. The counsel 'concede that this would not be equitable; but they insist that Barnet should be allowed for improvements, as muck as '¿he value of the rents, provided, the improvements cost as much as the amount of the rents. Whence this doctrine was derived, we have "been unable to ascertain. it seems to us, to be consistent with neither authority, principle, nor justice. The only case cited in support of it, is that of Thompson vs. Mason, and this case is insufficient to sustain the assumption. Craigmiles, under whom Thompson held, took possession of the land with the knowledge and assent of ■Grant, who owned it, and by whom it was devised to Mason’s wife. Craigmiles bought the land from Craig by a parol contract.
But Barnet did not buy the land from Bell, or occupy it with his assert or with that of his heirs.
The two cases are, therefore, widely different; and consequently, the authority ft the case, in IY. Bibbj fails in its application. There are other reasons why it does not bear on this case, but which it is not necessary to explain.
The decisions of this Court have not, even yet, established any uniform rule for adjusting rents and improvements in equity, in all the diversified cases which may arise. Each case must depend, in some 'degree, on its own peculiar circumstances. But if any one principle be more universal than another, it is, that an occupant who, having taken possession of another’s land, without his knowledge or assent, shall retain the possession against his will, after judicial notice, that it is his, and not the occupant’s, shall not be allowed pay for improvements made after such notice, excepting so far as they shall enhance the value of the land. 0
After such notification, he is, in the eye bf the law, a “mala fide” occupant, and all the reasons for allowing compensation for improvements in equity, entirely fail.
*530 Why then, should such an occupant be permitted to set off improvements against the rents, unless he shall have increased the value of the land to the extent of the value of the rents?
Such a doctrine is inconsistent with its own con-'•eession, and with the principle which it recognizes, arid oh which it professes io;be founded.
The owner of the land in such a case, has a dear and acknowledged right to the profits. This right can be extinguished, only by .paying him their equivalent. If the land be not enhanced in its value, he receives nothing in the improvements. They are of no value to him. Should he, therefore, be compelled to pay any thing for them? If he should, why should the amount be restricted to that of the rents, or reduced to any other standard, than that of their cost? They must be paid for, either at their cost, or at (heir real value. It is admitted, that the occupant will not he entitled to their cost, because, the reason for allowing him that, entirely fails. He must, therefore, be content to receive their vrdue, or in other words, their ameliorations. No reason has been intimated, nor can we imagine one, which would graduate the improvements by the profits.
A bona fide purchaser, who shall be evicted, may set off the interest on the consideration, against the •'■profits, in certain cases, and under certain qualifications; and when he is allowed to do this, he will not be bound to pay any thing for rents, beyond the Interest.
But the principle of this doctrine does not apply to -such a case as this. Between the two classes of cases there is no analogy whatever. And we are inclined To think, that the counsel have, inadvertantly, con■founded the cases.
To set off the improvements against the profits Since 1816, is not only a. misapplication, but a palpable perversion of the principle rvhichVegulates the adjustment of interest and rents. As the land is supposed to be worth the consideration, therefore, the use of the one-may be considered equivalent to that of the other.
Court judid-«Mjknow,. monweakh’s bank paper, bas heen de-predated establishment ¿„llie at any time,
Our opinion, therefore, remains unchanged, that for improvements since the decision bj this court, in 1816, Barnet is entitled to no more than the ameliorations. And, even this, he receives from the proscriptive bounty and indulgence of the chancellor. The measured am! inflexible justice of the common law, would not allow, him.one cent.
It is conceded, that the court has judicial knowledge of some facts, but the petition denies that it can judicially know that twenty-five dollars an acre, is too much for clearing one hundred acres of land in Green county, Kentucky. Suppose, instead of twenty-five dollars, the court had allowed twenty-five hundred dollars, would the counsel admit that the court .must know, judicially, that the allowance was exorbitant? Surely they would. But even then, we would be unable to answer, with precision; their interrogations. We could not tell them how many trees had been cut down, nor how large, nor of what kind they were, nor what would be the exact value of the laoor of destroying them.
We know, judicially, that the paper of the bank' of the commonwealth has been depreciated, ever since its first circulation; but as judges, we do not know what was the precise value of the paper, at any given period, or at any one place, as its valhe has been diSereht, at different times and places.
Would the counsel concede, that we would know, jodici lily, that one hundred dollars is too much for matting an axe? Then suffer us to retort the question, how much did the axe cost? -how long was the manufacturer employed in making it? How much iron and how much steel were expended in making it? What sort of an axe is.it? Can they respond ? Their inability to do so, does not prove that they do not know that one hundred dollars was an exorbitant charge for the axe.
They would know that ten dollars would be too much; but they might not know that four dollars would be extravagant.
They would also know, that five dollars would ex-seed the value of the ordinary- manual labor of one. *532 man, for one day; but they might not know that one-¿ollar would be too much.
By what process could it be ascertained by the court, without the proof of facts, that twenty-five hundred dollars an acre, would transcend the cost of clearing a large farm? By the same process, it mu^t be known that twenty-five dollars an acre would be too much.
There can be no one hundred acres of cultivable land in Kentucky, of the value of Bell’s land, the clearing of which, can be worth $2500, or twenty-five-dollars an aeree. We repeat that our knowledge of the prices of labor, and the topography of the country, will not permit us to doubt, that such a price, would exceed the actual cost.
If the court did not know what sort of a thing an-axe is nor the materials of which it is made, nor the ordinary labor employed in its manufacture, it could-not know, judicially, that one hundred dollars would be-more than its value.
The like knowledge of the like facts, enables the court to determine, that $2,500, exceed the cost of clearing one hundred acres of land.
What should be the precise value of the axe. or the-exact cost of clearing the land, we could not know* as these would depend, to some extent, on the peculiar facts of each case.
But no circumstances, within the range of probability, could extend the value of an axe, to one hundred dollars, or the cost of clearing one hundred acres of land, to $2,500. And therefore, in either case, the court would be authorized to decide that such a charge is exorbitant.
We have never heard before, of such a charge being made or sanctioned; and it seems to us impossible that it can be just; more especially, if the land was worth only one dollar and twenty-five cents per acre, annually, after such expensive improvements.
We have said, in the opinion, as much about the apple trees as we deem necessary,, or befitting the subject.
*533 In supposing that no allowance had been made for rents since 1816, we were mistaken. The singular manner in which the items are presented in the report of the commissioners, led to this mistake of fact. As it is detected, by a minute re-examinaiion of the record, it is proper to correct it, for the sake of historical accuracy, although its correction can have no influence on the principles or the effect of the opinion.
Wherefore, the only change which has resulted, in the opinion, from the reflections excited by the petition, is, that the circuit court is now directed to charge Barnet with rents, during the whole period of his occupancy,instead of charging him, as it did, with rents only from the institution of Bell’s suit, and in relation to which, the opinion was ambiguous, or at least left room to doubt.
Consequently, the petition is overruled.